## Case No. 14,955.

### UNITED STATES v. DEVLIN.

[7 Int. Rev. Rec. 44.]

Circuit Court, E. D. New York. Feb. 5, 1868.

VIOLATION OF INTERNAL REVENUE LAWS—FRAUDULENT DISTILLING—SPECIAL TAX—INDICTMENT—BURDEN OF PROOF—BAIL AFTER CONVICTION.

[1. In prosecutions for carrying on the business of a wholesale liquor dealer without a license, or without having paid the special tax, or without having kept the books required by the internal revenue laws, the burden is upon the defendants to show that they have a license or have paid the special tax and kept books as required.]

[2. Where, after conviction, time is granted for the prisoner's counsel to prepare a case and move in arrest of judgment, it seems that the court has no authority to take bail in the meantime.]

[This was an indictment against John Devlin for defrauding the government out of the tax on distilled spirits. There were indictments against Devlin and others for falsely branding spirits. See Case No. 14,954. The most material part of the defendant's evidence is given in the report below.]

Thursday, Jan. 30.

Immediately after the opening of the court, the question as to whether the count, charging the prisoner with not having kept books, should be retained in the indictment, was brought before the court by counsel for the prisoner. The judge ruled that he would retain it.

Moses Richards was the first witness called for the defence. He said that in 1866 he held the office of assistant assessor of the Fifth division of the Third district; the other assistants were Alex. M. Gurly, Nelson Northrup, and various others; a Mr. Robinson was assessor, and Mr. Bowen was collector; the business of witness was to canvass in the district and take in applications of license when brought in; on the 15th of each month a list was made of the applicants to pay special tax, and then sent into the assessor's office; knew Mr. Devlin well; also knew that he had sent in an application under the indictment; Devlin applied to him for registration; had some forms of application at that time, but wanted them; refused to give him one; furnished him, a week afterward, with a form; after having sent the form it was left at witness' office thirty days after it was sent him; put the paper in Mr. Northrup's office; had nothing to do with regard to the payment of the tax; previous to May or June, 1865, knew him only by reputation; never had any business transactions with him; was in charge of the Fifth division from November, 1865, to May, 1867; his office was No. 166 Johnson street; the plumber's shop was within his district; had been in the plumber's shop three or four times altogether; during the summer of 1866 saw Devlin every week; did not know what his business was except by hearsay; after he made his application found what he was; never saw him do business; never had his check for any purpose (prosecution here presented a check for $700 found in Devlin's check-book on the Atlantic Bank, made by Devlin to Mr. Richards. The check read "Aug. 21, M. Richards, salvage $700. Pay to bearer $700, John Devlin;) witness denied all knowledge of the check; check (produced) dated Aug. 20, for $550 was not in his handwriting; from May to August could not recollect any person who returned for a month over two barrels of whiskey; knew Peter Austin, distiller, for the four months from May to August he returned as shown by copies of returns (produced) only two barrels; made the returns of Burns.

Thos. A. Murray was examined. He said he knew Devlin; acted as clerk to him; remembered going with him to Mr. Richards in May last in regard to registry of an application for license; heard what passed between Devlin and Richards; Richards said he had not a form, but would get some that day and would send one down to Frank Devlin's plumber shop; afterward received a form of application; Jas. Devlin then got it, and it was handed, the last Sunday in June, to John Devlin; the blanks were filled up, and the Tuesday following the application paper was carried to Mr. Richards' house and laid on the desk; Mrs. Richards only was there inside.

Richards was then recalled. He said Patrick Burns was a distiller; but did not know anything about the capacity of his distillery; saw the paper (produced) which showed the capacity of his still was 125 gallons; could

not say whether that was so; was book-keeper in a distillery; the return of Patrick Burns for the month of May showed that taxes had been paid on 202 gallons of whiskey.

Friday, Jan. 31.

Immediately on the opening of the court the cross-examination by the district attorney of Moses Richards was resumed. The witness identified thirty-three applications for distilleries (produced) as having been made during his term of office, and transmitted by him to the assessor; identified monthly returns of distillers (produced) taken before him, and by him transmitted to the assessor's office; it was not his duty to visit these distilleries from day to day or week to week; was obliged to visit only once a month; did not remember that a distiller should make a statement every ten days as to the quantity on mash; that book (produced) was a tri-monthly book; but sworn statements were only made monthly; never was in the habit of signing blank affidavits; a blank, or rather partly filled form of affidavit (produced) was signed by him, but he did not see what it was signed for; when the registers for license came in he filed them on the back; the applications (produced) were signed by him according to usual custom; did not file or indorse Mr. Devlin's application; could not say whether any indorsement was filled on it or not.

The direct examination being resumed, the witness said that Devlin not being in his district he did not indorse the application, but had it put in Mr. Northrup's box; did not know who filled up the blank affidavit not sworn to; could not tell whether the blank affidavits in Mr. Rice's books were sworn to; never heard any complaint against himself of irregularity of conduct in the office of assessor; never before had seen the check-books of Mr. Devlin; knew nothing about them other than what was shown him in court; resigned at the suggestion of the assessor.

John W. Salvage testified that since the 1st of June, 1867, he had acted as clerk in the assessor's office, Third district of New York; found among the papers in the assessor's office an application from John Devlin; the paper (produced) was not that found, but this paper (produced) was the one found in the assessor's office; it was an application paper from Devlin, and found in the January monthly papers in the assessor's office.

Richard C. Egan, clerk in the assessor's office, deposed that an application paper was handed him in the office; he was searching for it at the time, but failed to get it, and another clerk of a former collector handed it to him; could not tell where the clerk got the paper; a Mr. Tappen handed it to him; found a paper in the assessor's office, of which he took a certified copy.

Charles Tappen, clerk in the collector's of-

dce, deposed that he knew an application paper had been handed in, and having searched for it, found it; if an applicant wished to pay in advance of the monthly list, the collector required the assessor to send up a duplicate of the application.

Thomas A. Murray swore that the partly-filled affidavit alluded to previously was not filled in by Richards, though he believed the signature was that gentleman's; could not say whether the paper found was the same as that handed in in May.

John D. Carrol deposed that official papers that went to Mr. Northrup were all turned over to the succeeding assessor.

Counsel on both sides then agreed that Mr. McCormack did not receive the application paper, or take it away from the assessor's office.

Mr. Evarts proposed next to read the receipt dated Feb. 6 and 7, for tax paid for the year ending May, 1867, also a receipt dated March 13, 1867, for the reassessment of Aug. 1, 1866, which was made necessary by the act of 1864 [13 Stat. 223]. Both papers were objected to.

Mr. Murray was recalled, and said he acted in Mr. Devlin's employment in the capacity of clerk; he kept no book, but did errands for Mr. Devlin, and sometimes filled up his check-books; took deposits on the bank for Francis Devlin but was paid by John; from February to May did not receive money from John Devlin to deposit in the bank; did nothing particular or general for him; was paid $20 a week; did everything he was asked to do; check-books were on the table, and anybody could write in them; often scribbled in them; could not tell his own hand-writing in blocks of check-books produced; John Devlin, wife and child, boarded in witness' house in Carlton avenue.

Mr. Evarts applied for permission to give oral evidence of the contents of the application-paper handed in in May which was refused. Documents relative to the granting of a license to Devlin in February last were handed in, after which the proceedings were adjourned to Monday.

Monday, Feb. 3.

THE COURT announced that he would exclude papers—a duplicate application and another paper found after Devlin's arrest—offered by the defence on Friday as evidence, but would give them the benefit of an exception.

Frederick J. Warburton swore to the accuracy of the stenographic report of proceedings taken before Commissioner Newton. As to the correctness of Mr. Cocheu's testimony, impugned by that gentleman, witness said the evidence was correct, with the exception of a few trifling verbal errors.

Charles Tappen, recalled and examined, deposed that in the book of special tax assessment the letters "D. N." meant "Demand Notice."

The district-attorney then offered in evi-

dence the testimony of Cocheu, taken before the commissioner.

The evidence was objected to, and his honor ruled it out. ·

The district-attorney next offered to read a letter written by Mr. Devlin to Mr. Cocheu, which would be corroborative evidence of the conversation between both gentlemen.

THE COURT admitted the evidence.

The handwriting of the letter having been proved, the document itself was read. It ran thus: "Oct. 2, 1866. Dear Sir: My liberal offer of this morning, the same as I extend to others, which you refused, is withdrawn. This is after reflection and consultation. Your manner seemed menacing and defiant. I never submit to it from any one, especially from one so vulnerable as Mr. Cocheu. If you wish me to consider it as a challenge to test our strength in certain quarters, I accept it. Yours, &c., John Devlin."

John W. Salvage swore that he made an abstract of returns (produced) which was correct.

Mr. Brady then spoke for the defence. He argued that his client was merely a broker, and it was therefore unnecessary for him to keep a book. He entered very fully into the case, arguing it at great length, and finally asked for a verdict for his client.

Mr. Stoughton replied on the part of the government. He recapitulated the evidence, and said from the state of facts presented, there was no other course open for the jury but to find a verdict for the government.

THE COURT then charged the jury: This case that now closes carries with it great responsibility. Responsibility on the jurymen in any case is no very light thing. It is dependent in this case, from the nature of the cause, for this is a revenue cause, an effort on the part of the treasury department of the United States to enforce the revenue laws of the country—laws upon which rest the credit of the country, laws which touch every portion of society, and upon which almost the life of the nation rests—most unpleasant laws, laws which must be enforced, which in any country that expects to live must be obeyed, both by the poor and the rich, by the powerful as well as by the weak, and those laws can be enforced in a free government but in two ways, and both lead through the courts of law. They provide as a means of enforcing them forfeiture, where the government seizes the property of persons claimed to have violated those laws, and confiscates, forfeits, sells it, hoping thereby to compel obedience to the laws by the milder form of punishment by losing property. The other feature—method of enforcing—is by criminal prosecution, in which a party is charged with offending those laws. Although having many severe features, although stringent in their terms, they are not necessarily harsh statutes. Whether they were so or were not, would be of small consequence here, for your duty and mine would be to impose them; but that you may not be under the impression that you are asked in this or in any other case to enforce a law that is hard and harsh, it is only necessary to consider that in the first place for violation of that law, it rests with the government prosecutor whether he will prosecute. If he determines that the prosecution must be pursued, the matter then goes before the grand jury, and the grand jury must say whether they think it must be prosecuted. If they so declare by their indictment, it comes into a court of justice, before a court and jury, and there, in most instances, great discretion is conveyed, giving to the court in the matter of punishment, as in this case, the option to inflict a fine ranging from $10 to $500, and the term of imprisonment from a few days to two years; and if the grand jury found the man guilty, the case comes, as I said, before a petty jury, so that the law is law, and may be enforced without any unnecessary harshness. Now, government having tried, as is well known, in the enforcing of this revenue law, the milder form of punishment by forfeiture, has at last been driven to resort to criminal prosecution. It is the last resort. If criminal offenders against the United States can pass through courts and go free, there is no other way in a free government by which the revenue can be collected. Upon the juries of the country rests the responsibility of saying in all revenue cases whether or no this law shall be obeyed, and that is the responsibility that is upon you in this case. Now I don't say this to have you suppose that this man's cause is to be disposed of upon no general considerations, nor upon facts or law of other cases. He is entitled here in this case, as every criminal, every prisoner, every defendant is, to have his own case judged upon its own law and its own facts, without reference to its effect upon the community, and that must be the judgment in this case. But every criminal prosecution has two objects in view, one to punish the offender for the crime he has committed, and the other by the example to prevent others from committing the like offence, and so that the general consideration of the object of these prosecutions is the proper thing—the necessary thing for you to consider in order that you may come to a proper conclusion. Realize the responsibility which rests upon you when you are called upon to decide a case of this kind. I am making these remarks with reference to the responsibility more freely in this case, because, I say frankly and under a sense of my own responsibility, that under the law, as I understand it, and under the evidence as it appears to me, there is no doubt as to the judgment which should follow the prosecution. In such a case, where there is so little doubt, the responsibility comes upon

the jury clean and clear. It should be realized. Now, this is no action to recover $50 or $100. It is no case of a contract between the government of the United States or any of the United States officers and John Devlin. It has another signification. As a matter of money, it makes but little difference whether a man of the Ninth or Fifth ward runs a distillery, produces a few gallons of whiskey, or whether this prisoner brought fifty or one hundred gallons, and did not pay the tax on them into the treasury on such a day. It is, as a matter of money, little; but whether or no this man or the other man shall or shall not obey the law is a matter of great moment, and that is the question here. This man is prosecuted because he has, if the facts be true as the witnesses have sworn, because he has declined and refused to obey the law, and that gives the case a great significance. Now realize your responsibility. I call your attention to your rights and duties as jurymen, to rights and duties which you, in common with all juries called in courts of justice, have in this case. In our country a jury in most classes of cases, is a part of every court of justice. In many lands there is no jury; cases are passed on—all the facts—by one judge or three judges. In our country, in some classes of cases, the judge passes upon the law and facts. In the admiralty cases tried here I am never assisted by a jury, for I myself alone have to assume the responsibility and pass upon the law and facts. But in ordinary court cases there is always in our country a jury, and the jury passes upon the facts, and the court passes upon the law. Under that class of cases, there are also other considerations that the judge there has the right, as in civil cases, to indicate to the jury to direct their verdict by his own opinion of the evidence. When there is no dispute about the facts, then the judge directs the jury, and the jury find upon the opinion of the court on the evidence what the verdict should be. But when you come to a criminal case, under our form of government the case must always go to the jury, and the responsibility shifts from the court to the jury, who pass upon facts, and whose verdict is final. They pass upon the facts alone; they take the law. You must take the law in your case as you receive it from the court; you have no right to differ; you have no right to doubt, for the purposes of this case.

The law as declared from the bench is the only law you can look to. That law you have a right to apply to the facts as you find them, and on that you render your verdict—which is conclusive. That is your duty here, to consider the facts, and I will declare the law. Let us look to see what the case is—for you must still remember this case is the case we are to try and no other. This man, the prisoner at the bar, is charged with three offences, all made criminal

by the law. In the first place, he is charged with having carried on the business of a wholesale dealer in liquor, from the months of May to September, 1866, without having a license. In such a case the onus of proof, as to whether a man has or has not a license, rests on the defendant. The government is not bound to prove that a man has a license, for the very simple reason that that man has merely to produce his license if he has one. In this case, from the evidence as it stands, there is no evidence to show that a license has been taken out by John Devlin for carrying on the business of a wholesale dealer in liquor from May to September, 1866; so that the question is, "Did he carry on the business of a wholesale dealer in liquor in this district during that period?" That is the question of fact for you to pass upon. The definition of a wholesale dealer is fixed by the statute, which declares that a wholesale dealer is a person who shall sell liquor in quantities exceeding three gallons to one person at the same time, and a person who carries on that business of dealing in those wholesale quantities is an offender where he has no license. So then you see clearly the question you have to ask yourselves. Look at this, which I think is the second count, but which in point of time is the first charge. Did he carry on the business of dealing for gain in disposing of those wholesale quantities of liquor in this district? If you find that he did, why then you are bound to render your verdict of guilty. You heard the evidence here. You have heard what the witnesses said, and you are bound to believe the witnesses unless in the circumstances attending the transaction as proved, or in the other matter there was something to lead you to discredit their statements; but if there are no circumstances which lead you to doubt the evidence of Mr. Paffer, Cunningham and another witness which you recollect having before you—if you believe the statements of these witnesses, then you are bound to say the man carried on the business of a wholesale dealer in liquor at this time without having had a license. There is no evidence in the case that will warrant you in finding he was a pedler. The question is, was he a pedler, after the definition of a pedler as given in the statute? And I charge you that he was not, and the person, if he feels aggrieved by this statement of the law, may have the benefit of an exception. We dispose of the first charge. The simple question of fact I don't direct on. I direct the law, and upon you is the responsibility of saying if this man carried on the business as a business of dealing for gain—this dealing in the article of liquor—during the period I have mentioned.

Now, the next charge, which is the first charge in this indictment, is that, after September, he carried on the business of a wholesale dealer in liquor without having

paid a special tax. The 1st of September the law was changed, no more licenses were required, but a man was bound to register himself, as he was under the first statute, with the assessor of his district, and after registering to apply to the collector, and there pay the sum which was called special tax, for which he got a receipt; and it is declared by the law that any man who carries on the business without having paid the special tax is a vender; and the charge is here that after this law came into operation, which was after September, the person charged—the accused—carried on the business of a wholesale dealer in liquors without having paid this tax. Here also, as in the other case, the burden did rest upon him to prove that he had paid the tax, and he has failed to prove he paid it. So here it is the same question as in the first charge. Did he, during this different period, carry on the business of a wholesale dealer in liquor? It is sworn to by others of these witnesses. You remember what the evidence is. You will consider and say, on your oaths, whether or no he dealt in this article of liquor, in quantities exceeding three gallons, for the latter period mentioned in the indictment. The third charge is distinct, arising out of the same person's occupation, and it is that he failed to keep books as provided by law. The law in that behalf declares that every wholesale dealer in liquor shall keep a book stating in it the persons from whom he buys, the quantity of his dealings, and it makes it a penalty—an offence—not to keep this book, and that is the law of the land. It was a law which was obligatory upon this man if he was a wholesale dealer, and the question here is, as in the other, had he kept a book in which his sales were entered and his purchases? But it is not shown that he did keep a book. The burden was upon him, and you will recollect the evidence of the witnesses on that point. If he was a wholesale dealer and failed to keep a book, then he must be found guilty under this charge. Those are the three charges to be borne in your mind. They are distinct from each other, and must be passed on by you, and they are, as I said in the first place, by no means trivial. Then the difficulty about this law is that many suppose that the simple feature of it is one particular thing; that each particular thing is trivial and unimportant. It is not for you or me to say whether it is important that he should keep a book, but the law says that he shall. So then, gentlemen, there you have the case. Three charges against the man are to be passed upon by you, and your verdict is to be rendered by your oaths as you find the facts to be. Only one conclusion can be arrived at, but it will be your conclusion and not mine. This person—this prisoner—is entitled in this case, as every prisoner is, to the benefit of every reasonable doubt upon the facts. It must be a reasonable doubt,

and that he should have, if a reasonable doubt can be found to exist. Your duty is, under the law, to consider the evidence, and if you believe the testimony that has been offered, and you think there is no reasonable doubt but that he carried on the business, in these quantities, you will find him guilty—otherwise you will acquit him.

After an absence of about ten minutes the jury returned with a verdict of guilty on all three counts.

Mr. Evarts asked for time to make a case and to move in arrest of judgment, and on consultation between counsel and the court the 24th of February was fixed for the hearing of the motion.

THE COURT then ordered the accused to be remanded to custody. His counsel stated that they supposed he was already on sufficient bail in this case and under the other indictments. [See Case No. 14,954.]

The district-attorney said it was not sufficient in the present state of the case, and there might be a doubt as to taking bail after conviction.

### Application to Put in Bail.

Wednesday, Feb. 5.

BENEDICT, District Judge, gave his opinion on the application to admit the prisoner to bail. He said: "I have considered the matter of bailing John Devlin, and made inquiries as to the practice in the Southern district court. A doubt is supposed to exist as to the power of taking bail after conviction under the words of the statute which permits bail to be taken. The practice seems to have been not to take bail. There being a doubt with the court as to taking bail that is sufficient to defeat the application in the present case, the prisoner must be remanded until the argument takes place."

[A motion for a new trial was subsequently made, and denied. Case No. 14,953.]